IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**RICHARD ELMO WARREN**                                                                 **PLAINTIFF**

**V.**                                          **CASE NO. 5:19-CV-05115**

**SHERIFF TIM HELDER and**
**MAJOR DENZER**                                                                      **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Plaintiff Richard Elmo Warren has filed this civil rights action contending that he was subjected to unsanitary living conditions while he was incarcerated in the Washington County Detention Center ("WCDC"). Specifically, for the 22 days he was housed in F-block, he alleges the jail failed "to maintain proper upkeep" due to "flooded floors [and] leaking toilets," which he claims led to "staphylococcal infection." (Doc. 18, p. 4). Warren proceeds *pro se* and *in forma pauperis*. He names as Defendants the Washington County Sheriff, Tim Helder, and the Jail Administrator, Major Denzer. He sues the Defendants in both their individual and official capacities.

The case is before the Court on a Motion for Summary Judgment (Doc. 26) filed by the Defendants. Warren has filed a Response (Doc. 47). For the reasons stated herein, the Motion is **GRANTED**.

### I. BACKGROUND

On April 20, 2019, Warren was booked into the WCDC on pending criminal charges. (Doc. 28-2 at 1). He remained incarcerated there until February 5, 2020. (Doc. 47 at 54).

On April 25, 2019, only five days after he was first booked into the jail, Warren was

1

treated for an abscess on his left buttock. (Doc. 28-4 at 7). He complained that the abscess had been draining and was causing him difficulty in sitting or lying down to sleep. *Id.* Warren was treated with Bactrim, Meloxicam, and a second blanket. *Id.* The abscess was incised. (Doc. 28-9 at 60). At the time he developed this abscess, Warren was housed in B-block. (Doc. 47 at 2).

Warren was seen by Dr. Robert Karas on April 26, 2019. (Doc. 28-4 at 6). Dr. Karas examined the abscess and offered to incise it again. *Id.* Warren preferred to try antibiotics since the abscess had improved "a bit" from the day before. *Id.* Warren was prescribed Tylenol, as well. (Doc. 28-9 at 60). The antibiotics resolved the abscess. *Id.* Since that time, Warren has not sought treatment for any other infections. *Id.*

Warren was moved to F-block on May 9 or 10, 2019, and remained there for about 22 days. (Doc. 28-9 at 27, 30). Following an altercation, Warren was moved to disciplinary segregation for about 20 days and then transferred to L-block. *Id.* Warren testified at his deposition that every one of the toilets in F-block was leaking water "out from under them," and he believed the leaking water to be sewage water. (Doc. 28-9 at 19). When asked if he ever saw any fecal matter in the water, Warren indicated that the water was very dirty and was leaking from under the toilet, but that he did not see "big chunks of fecal matter." *Id.* at 9. The water was also running into the nearby shower drain. *Id.* at 22. The water was "a good half-inch deep" and "sloshed over your socks." *Id.* at 19. Warren claimed that if you sat down to use the toilet, "your pants and your boxers . . . got wet." *Id.* at 20. There were four toilets and a shower on one side of the bathroom area in F-block. *Id.* Warren testified that if a blanket were wrapped around

2

the base of the toilet, it only took 30 minutes before the blanket was soaking wet and would be leaking into the restroom area again. *Id.* The inmates wore "flip-flops" in the pods and tracked the water around. *Id.* at 21, 25. According to Warren, these conditions existed every day from May 14 until June 2, 2019. *Id.*

With respect to cleaning supplies, Warren indicated that the inmates received a broom and a mop and bucket with "maybe a splash of some cleaning supply" in it up to three times a day—generally every six hours during the day.[1] (Doc. 28-9 at 26–31). Warren testified that sometimes he could smell bleach in the bucket, but most of the time he believed it was just water. *Id.* at 26. The officers also sprayed the tables with some type of cleaner after each meal. *Id.* at 26-30. Once the inmates and officers cleaned the block after dinner, the cleaning supplies would not be distributed again until after breakfast the following morning. *Id.* at 31. The inmates requested cleaning supplies more often because the restroom stall areas would be "completely flooded . . . with water . . . [a]t least half-inch [deep] within an hour, hour and a half." *Id.* at 31. Also, at least once a day, the officers would bring a squeegee mop into the pod to absorb the standing water. *Id.* at 27.

On May 21, 2019, Warren submitted a grievance complaining that the toilets in every stall were leaking and that water was covering the floor and running into the shower drain. (Doc. 28-3 at 7). On May 24th, Corporal Mulvaney responded in writing, noting that maintenance had fixed a couple of issues in the last few days. *Id.* at 8. On May

---

[1] In his Response, Warren states there were times when the inmates only received cleaning supplies twice a day. (Doc. 47 at 39).

3

24th, Warren responded that he had been living in F-block for nine or ten days and that maintenance had still not addressed the leaking toilet issue. *Id.* Warren submitted another grievance stating that every time he asked for a squeegee or a mop with bleach water, he was told that it was not an emergency. (Doc. 28-3 at 10). Sergeant Pineda responded to Warren's grievance by explaining that if Warren had been pressing the intercom button to try to obtain the mop and bleach, this was inappropriate behavior because the intercom was only supposed to be used in case of medical emergencies. *Id.* Warren was informed that he should ask the deputies for more cleaning supplies during the deputies' hourly jail checks. *Id.* On May 30th, Warren responded to Sergeant Pineda in writing, explaining that he had asked both the floor officers and the officers in the control room three or more times a day since May 14th for cleaning supplies and had been told "no" every time because it was not an emergency. *Id.* at 13. Warren also complained that the deputies had quit giving them blankets to help soak up the water about a week before. *Id.*

On May 30, 2019, Corporal Mulvaney informed Warren in writing that he was still trying to get with maintenance and figure out what was going on. (Doc. 28-3 at 1). Corporal Mulvaney reported that maintenance had been present in F-block at least twice in the last few days fixing issues. *Id.* Warren then responded that maintenance had only "played with the sinks." *Id.*

On June 5, 2019, Corporal Mulvaney noted that Warren had been moved to disciplinary segregation. (Doc. 28-3 at 2). On June 13th, Warren lodged another grievance stating that the problems had not been fixed and that toilet water was still

4

soaking his and everyone else's socks, pants, and boxers. *Id.* at 5.  Further, Warren asserted that maintenance would come into the pod but not fix the issue. *Id.*  On June 14th, Warren wrote in a grievance that the toilet situation had not been resolved and that he had been getting "the run around." *Id.*  On June 21st, Corporal Mulvaney responded in writing that he had learned that another leak, caused by a pencil being shoved into a sink, had been fixed during the first week in June. *Id.* at 3.

Doc. 28-6 is an exhibit containing a log of maintenance records for plumbing work performed in the WCDC.  Below is a description of these records for the time period relevant to the Complaint:

- May 1, 2019.  The shower in F-Block was running, and the "[f]irst and last" toilets were leaking "around the base."  Sam Caudle adjusted the timer.  The record does not reflect a complaint about leaking toilets. (Doc. 28-6 at 2).

- May 4, 2019. "Toilets 2 and 3 in F-Block will not flush properly.  When toilet 2 flushes, the waste from toilet 2 goes into toilet 3 and vice versa."  Caudle recorded on the bottom of the record that this was "a plumbing design issue that we have no control of." *Id.* at 3.[2]

- May 9, 2019. "F-block toilets are leaking around the rim (floor area) and we keep having to replace blankets around the toilets and strips because of them getting wet.  Please look into this and see why the water keeps coming out from the base of the toilet."  Caudle notes that he repaired a "busted supply line" on May 14th. *Id.* at 4.

- May 9, 2019. "F-block shower on sink side only runs 3 to 5 seconds."  Caudle

---

[2] On April 3, 2019, this problem was the subject of a repair ticket. (Doc. 47 at 19). Caudle responded: "If you will look in the plumbing chase you will see that the toilets are designed in this manner.  This is not the only block that is designed this way." *Id.*  On September 4, 2019, this same issue was the subject of another maintenance request. *Id.* at 31.  Caudle responded: "Toilets are working as designed." *Id.*  A second maintenance ticket was submitted that same day. *Id.* at 32.  Caudle responded: "Working fine at this time." *Id.*  On October 10, 2019, yet another maintenance ticket was submitted on this issue. *Id.* at 34.  Caudle responded: "This problem has been fixed." *Id.*

5

"[a]djusted time on shower" on May 14th.  *Id.*

- May 18, 2019. "F Block: 2 toilets are leaking." On May 23rd, the water leak was noted as "repaired." *Id.* at 6.

- May 18, 2019. "The first sink in F-Block pressure is too high." Caudle changed the diaphragm in the sink. *Id.*

- May 25, 2019. "3 Sinks are not working properly—have not been fixed. Toilets are still leaking. F-Block." On May 28th, the inside diaphragms and inside orphis were "changed." *Id.* at 7.

- May 28, 2019. Staff typed a detainee request directly into the record as follows: "the bathrooms have been flooding since i have been here. they said they fixed it but we still have to wade through water every time we go to the bathroom on the toilet or sink side its the same. everytime i go to the bathroom i have to shower off from the knee down due to my concerns seriously." At the bottom of the record is the following notation: "please do not turn in detainee request. Sam [Caudle] was in there this morning and fixed the leak." *Id.*

- May 29, 2019, "F Bloc[k]: toilets or plumbing chase is leaking. Water is around 3 of the four toilets." On June 5th, Caudle "replaced inner diaphragm." *Id.* at 8.

Exhibit 28-5 is a series of 25 photographs showing a toilet, plumbing fixtures, and what appear to be drains. *Id.* Several of the photos show toilet paper on the floor around a toilet. *Id.* However, none of the photos depict standing water. *Id.* Warren was shown these photographs during his deposition and agreed that "the floors around those toilets [we]re completely dry" in the pictures. (Doc. 47 at 36). He also noted that the toilet paper appeared to be completely dry. *Id.* Warren suggested that the photos were not taken in F-block or were doctored or manipulated in some manner. *Id.*

The WCDC was inspected by the Criminal Detention Facilities Review Committee on July 15, 2019. (Doc. 47 at 56-65). The Report of the Committee noted that "[w]ith the high number of inmates, staffers are not able to address needed maintenance goals/physical plant objectives. (As an example, due to current trends, the staffers are

6

not able to properly update a number of plumbing fixtures and general components such as doors)." *Id.* at 58.

Warren testified that he believed Sheriff Helder and Major Denzer "were fully aware of the situation" regarding the toilets. (Doc. 28-9 at 34). Warren maintains that the inmates said something to the officers doing their hourly rounds "every time they came into the barracks." *Id.* at 34. Further, when Warren asked to speak to someone higher than a sergeant about the problem, he claims his request was denied every time. *Id.* at 40. Warren testified that if Sheriff Helder were not aware of all the problems with the plumbing at the facility, "then he has neglected to do his duty as the sheriff to oversee the Washington County Detention Center and to maintain . . . sanitary healthy living conditions." *Id.* at 41-42. Warren claims he specifically asked to speak with Sheriff Helder and was told it was not allowed. *Id.* at 44.

Warren testified that he named Major Denzer as a Defendant because he oversaw the operations and functions of the detention center. (Doc. 28-9 at 46). It is Warren's opinion that if Major Denzer were not aware of the situation in the WCDC, then he was "very much . . . neglecting his duty." *Id.* at 46-47. Warren believes Major Denzer "oversees everything and also sees all the work orders, gets all the reports of everything going on at the [WCDC] as far as all the situations with the toilets." *Id.* at 47. Warren is also under the impression that grievances probably go to Major Denzer, or at the very least, he knows about them. *Id.* Because the problems with the toilets went on for a long period of time, Warren thinks that Major Denzer was "extremely negligent in his duties . . . at the WCDC." *Id.* Warren was never able to talk to Major Denzer directly

about his complaints because staff would not allow this. *Id.*

With respect to his official-capacity claim, Warren asserts that it is based on Defendants' failure to repair and update the WCDC. (Doc. 28-9 at 54). Warren named Sheriff Helder and Major Denzer to answer for this claim because "they're in charge." *Id.* Warren does not believe that Sheriff Helder and Major Denzer are responsible for everything that happens in the detention center. *Id.* at 54-55. However, with something as widespread as the plumbing problems, which Warren maintains existed in eleven out of fifteen cell blocks, he believes these Defendants are responsible and should have been aware of the problems. *Id.* Warren states that the Defendants should have received a "years' worth of work orders and it . . . shows a pattern for months and months from before and after and also including the time frame that mine was going on . . . that . . . they've done nothing about it." *Id.* at 57.

Warren's abscess on his left buttock (described previously) is the only injury he believes he has suffered due to exposure to the water coming from the leaking toilets.[3] (Doc. 28-9 at 60–62). Warren testified, however, that he also suffered mental anguish because he worried about staph infections breaking out on his body and because he went to sleep at night in his bed with his boxers, pants, socks, and blankets wet with "sewage water." *Id.* at 63. Warren asserts that the situation was "very disgusting and . . . disturbing." *Id.* at 68. He has not been treated by a mental health professional to date,

---

[3] Warren has also submitted signed statements from four inmates at the WCDC who claim they contracted infections while incarcerated there. None of the inmates claim that their illnesses were caused by unsanitary conditions in the pod restrooms; they simply state that they suffered illnesses and received treatment. (Doc. 47 at 9–12).

but he maintains that simply because he did not seek professional treatment "does not mean that [the situation at the jail] did not mentally affect [him]." *Id.*

By affidavit, Sheriff Helder explains that he employs a chain of command to supervise the employees of the various divisions within the jail. (Doc. 28-10 at 1). The chain of command is divided by division and rank. *Id.* Major Denzer is the head of the detention center. *Id.* Sheriff Helder explains that he counts on the chain of command

> to administer the various operations of the sheriff's department pursuant to the policies and procedures I have implemented. This includes maintenance and upkeep of the detention facility. When problems arise or are alleged, those below me in the chain of command assess and handle those problems to the extent they are able. I am generally not personally involved unless the problem is systemic or not capable of resolution by my staff. *Id.*

Sheriff Helder maintains that he was unaware of the maintenance issues referenced in the Complaint until he was served with the lawsuit. (Doc. 28-10 at 2). Sheriff Helder indicates that "[r]eporting and addressing an issue of the sort described by the Plaintiff would have been a routine part of the operations of the detention center and a function in which I would not be normally involved." *Id.* Because of the size of the WCDC, Major Denzer explains that he must also "count on that chain of command to administer the various operations of the Detention Center." (Doc. 28-11 at 1). Major Denzer maintains that the chain of command

> includes communication with inmates through the grievance and request system and the regular maintenance and upkeep of the detention facility. When problems arise or are alleged, those below me in the chain of command assess and handle those problems. It is only when the issue cannot be solved by those to whom such issue is regularly assigned that the issue will be brought to my attention. *Id.*

Finally, the Court has been provided with video contained on seven DVD-R discs.

9

(Doc. 28-8). The camera is located at the front of F-block and shows the dayroom, the open barracks living quarters, and the restroom area. The right portion of the restroom contains the toilets with walls separating them from the dayroom. These walls are between waist and shoulder height and provide some privacy, although there are no doors attached to the stalls themselves. There are four toilets and one shower in the stall area. The left portion of the restroom area contains the sinks and another shower. A wall separates the two areas.

The video quality is grainy and difficult to make out. Each of the DVR discs contains video from a single day and two different time periods during that day. What follows is a brief summary of each day depicted on the videos:[4]

### Day One

**5/20/19  0500-0750**     No evidence of water in dayroom, of blankets being delivered or taken away from the restroom, or of the use of a squeegee or mop. No observable water on the floor in front of the toilets. No evidence of wet footprints coming from the stall area. The toilets themselves and the immediate area around them cannot be seen.

**5/20/19  1100-1410**  The same as the first time period.

### Day Two

**5/21/19  0500-0705**  The same as the first time period.

**5/21/19  1100-1300**  The same as the first time period with the following addition: A dust mop passes in front of the entrance to the stall area.

---

[4] Warren indicates that he was provided with 40 to 60 hours of video footage. (Doc. 47 at 36). Clearly, he was provided more video footage than what was provided to the Court. Warren also admits that much of the video footage is not relevant to his claim. *Id.*

10

### Day Three

**5/22/19  0500-0700**  The same as the first time period.

**5/22/19  1030-1245**  At approximately 2:09:43,[5] an inmate can be seen taking a bag into the stall area and picking up what appear to be wet blankets from around the toilets. He carries the bag out and returns with a squeegee which he then uses to push water from around the toilets to an area outside the frame of the video. The volume of water cannot be determined from the video. When the inmate exits the stall area, his wet footprints can be seen on the floor.

### Day Four

**5/23/19  0500-0650**  At approximately 1:47:44, an inmate uses a squeegee in the stall area. Once again, the volume of water cannot be determined from the video.

**5/23/19  1030-1250**  At approximately 2:17:20, a squeegee is placed in the stall area. An inmate uses the squeegee in the shower and back two stalls. However, because of the distance from the camera and the dividers between the toilets, it is impossible to determine the volume of water involved or if any of it originated from the toilets. The video ends before the inmate enters the stalls closest to the dayroom.

### Day Five

**5/24/19  0500-0650**  At approximately 1:46:20, an officer sprays the stall area with cleaner. An inmate enters the stall area with a squeegee. The inmate goes over to the sink side. The officer returns to the stall area with the inmate and they stand observing the first stall. The officer enters the stall and appears to be pushing something with his foot. The inmate then begins using the squeegee. However, it is impossible to determine the volume of water involved. The video ends with the inmate at work in the stall area.

**5/24/19  1030-1250**  At approximately 2:16:49, an officer begins spraying the tables and the bathroom areas. An inmate brings a squeegee into the stall area and begins using it toward the rear of the stall area. However, it is impossible to determine the volume of water involved. The video ends with the inmate at work in the stall area.

---

[5] These numbers are taken from the video timer.

11

**Day Six**

**5/25/19  0500-0740**  At approximately 2:36:58, an officer enters with a spray bottle of cleaning fluid and sprays the tables and both sides of the bathroom. The video ends before anyone begins cleaning the stall area. No visible water. No visible wet footprints.

**5/25/19  1100-1340**  No visible water. No visible wet footprints. Beginning at approximately 2:35:50, a mop and bucket are brought into the block. A short time later, an inmate brings in the squeegee and is carrying a dark colored towel or blanket which he places on a wall in the stall area. The inmate, who has rolled up the hem of his pant legs, begins using the squeegee to push water to the rear of the stall area. The video ends with the inmate at work in the stall area with the squeegee.

**Day Seven**

**5/26/19  0500-0811**  At 3:00:04, an inmate places a blanket on the wall by the first stall. At 3:01:33, an inmate gets a plastic bag, goes to stall one, and takes a blanket that appears to be wet and puts it into the bag. As he walks away from the stall, his wet footprints are visible on the dayroom floor. At 3:02:19, another inmate begins using a squeegee in the stall area. He appears to be pushing water from the first stall towards the back of the stall area. He is still working on the first stall area at 3:04:48. He also uses the squeegee on the dayroom floor immediately adjacent to the stall area. He continues using the squeegee in the stall area for several more minutes. At 3:08:40, two other inmates bring blankets to continue drying the floor. At 3:10:10, the fresh blanket is put into the first stall.

**5/26/19  1100-1340**  No visible water in the stall area or the dayroom area. However, when the video begins, there are what appear to be one or more blankets on the wall of the first stall.

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made

12

a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

The summary judgment record confirms that Warren complained consistently to jail staff about toilet water leaking from the base of the toilets[6] in the restroom area of the pod where he was housed for approximately 22 days. The record also appears to confirm that the problem was never fully resolved—or at least not resolved for very long. Whenever Warren complained, jail staff responded to him in writing and also put in repair requests with maintenance. Mr. Caudle from maintenance visited F-block multiple times to fix the toilets, but it seems he was never quite able to get the leaking problem under

---

[6] Warren does not allege that the toilets overflowed or failed to flush.

control. It is not clear whether the age of the facility and fixtures were the true problem or whether Mr. Caudle was simply not competent at his job. Regardless, there is no dispute that the WCDC responded to the problem through maintenance requests and attempted to manage the excess water by providing blankets, a squeegee mop, and cleaning supplies to the inmates.

Warren is understandably concerned that the water that leaked from the base of the toilets was contaminated in some way, though he offers nothing but his suspicions to substantiate this claim. The Court agrees with Warren that standing water in and around the restroom area of the pods is a problem that should be taken seriously by the Defendants—now that they are both on actual notice—because allowing standing water to pool constantly in and around the toilets subjects the inmates to the danger of slipping and falling. Further, the Court does not discount the possibility that the water pooling around the base of the toilets could become contaminated with feces or urine and then cause disease or infection among the inmates. However, in Warren's particular case, there are no credible facts to show that the leaking toilets caused him to sustain any illness or physical injury. Warren sought medical treatment for a boil on his left buttock only five days after he was first booked into the jail—before he was assigned to F-block and before he began filing grievances about the toilets. For the rest of Warren's incarceration at the WCDC, he did not seek medical treatment for any ailment.

Though the Court is sympathetic to the nuisance and frustration that the leaking toilets must have presented to Warren—and, indeed, to all the inmates—this condition of confinement did not violate Warren's constitutional rights. According to the Eighth

14

Circuit's recent decision in *Stearns v. Inmate Services Corp.*, 957 F.3d 902 (8th Cir. 2020), a pretrial detainee's conditions-of-confinement claim must be analyzed under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's Cruel and Unusual Punishment Clause that applies to convicted prisoners. The standard for determining whether conditions have violated a pretrial detainee's due process rights is therefore an "objective" one: The trial court must ask whether the conditions of confinement, viewed in the light most favorable to the detainee, amounted to "punishment" of the detainee before he was ever found guilty of any offense. *Id.* at 908–09.

This objective standard was first set forth in the Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520 (1979). There, the Court explained that the government "may subject [pretrial detainees] to the restrictions and conditions of [a] detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id.* at 536–37. Accordingly, to prove a due process violation, a pretrial detainee must show either "an expressed intent to punish on the part of detention facility officials" or conditions in the facility that are "excessive" and not "reasonably related to a legitimate governmental objective"—thus, amounting to a de facto punishment. *Id.* at 538–39. The Due Process Clause may certainly be implicated when a detainee is forced "to endure genuine privations and hardship over an extended period of time." *Id.* at 542. Short of that, a constitutional violation will not be established.

In the case at bar, there is no evidence that the WCDC has expressed an intent to punish inmates by failing to fix leaking toilets or by subjecting inmates to the conditions

caused by leaking toilets. On the contrary, the WCDC's policy was to respond to Warren's grievances in writing, summon the maintenance department to fix the toilets, and provide inmates with blankets, mops, and cleaning supplies to ameliorate the conditions. Though the leaking toilets continued to cause problems while Warren was housed in F-block, these conditions, though certainly suboptimal, did not amount to "genuine privations and hardship over an extended period of time." Eighth Circuit case law supports the Court's conclusion. *See, e.g., Goldman v. Forbus,* 17 F. App'x 487, 488 (8th Cir. 2001) (per curiam) (no constitutional violation where pretrial detainee was forced to sleep on the floor next to the toilet for six nights and was sprinkled with urine when his cellmates used the toilet); *Smith v. Copeland,* 87 F.3d 265, 268 (1996) (requiring an inmate to spend four days in a cell with an overflowed toilet did not rise to "a level of constitutional significance"); *White v. Nix,* 7 F.3d 120, 121 (8th Cir. 1993) (inmate's eleven-day confinement in a cell containing dried human fecal matter did not constitute an Eighth Amendment violation); *Cody v. Newborn,* 2012 WL 1078601, at *9 (W.D. Ark. 2012) (no unconstitutional condition of confinement created when toilet in cell did not flush for several days at a time).

As Warren has failed to establish a genuine, material question of fact as to whether his constitutional rights were violated due to the leaking toilets in the WCDC, both his individual-capacity and official-capacity claims must be dismissed. *See Schmidt v. City of Bella Villa,* 557 F.3d 564, 571 (8th Cir. 2009) (finding that a § 1983 claim requires "(1) that the defendant(s) acted under color of state law[ ] and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right").

## IV. CONCLUSION

For the reasons stated, the Defendants' Motion for Summary Judgment (Doc. 26) is **GRANTED**, and this **CASE IS DISMISSED WITH PREJUDICE.** A separate judgment will be entered this day.

**IT IS SO ORDERED** on this 6th day of August, 2020.

/s/ TLB
_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE